FILED
9/5/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
MEN

AO 91 (Rev. 11/11) Criminal Complaint AUSA Anthony Chmura (312) 469-6049

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

LAMARCUS JOHNSON

CASE NUMBER: 26 CR 478
**UNDER SEAL**

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about June 2, 2026, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Knowingly and intentionally distributed a controlled substance, namely 40 grams or more of a mixture and substance containing fentanyl, a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

_X_ Continued on the attached sheet.

SEAN AHERN
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: September 5, 2026

*Judge's signature*

City and state: Chicago, Illinois

YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**AFFIDAVIT**

I, SEAN AHERN, being duly sworn, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and have been so employed since approximately September 2018. My current responsibilities include the investigation of firearms offenses, violent crimes, and narcotics trafficking offenses.

2. As part of my duties as an ATF Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the federal controlled substance laws, including, but not limited to Title 18, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods and the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

3. This affidavit is submitted in support of a criminal complaint alleging that Lamarcus JOHNSON, also known as JAX, has violated Title 18, United States Code, Section 841(a)(1).

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging JOHNSON with distributing 40 grams or more of fentanyl, in violation of Title 21, United States Code, Section 841(a)(1), I have not included each and every fact known to me

concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

5. This affidavit is based on my personal knowledge; my review of reports and documents related to this investigation; my review of video recordings related to this investigation; conversations with others who have knowledge of the events and circumstances described in this affidavit; my review of law enforcement databases; my own training and experience and the training and experience of other agents with whom I work; and information provided to me by local law enforcement officers, and from persons with knowledge regarding relevant facts.

## FACTS ESTABLISHING PROBABLE CAUSE

### A. Summary of Investigation

6. In summary, and as further described below, between May 13, 2026 and June 2, 2026, an undercover ATF agent ("UCA"), along with confidential sources, conducted three controlled purchases of narcotics from JOHNSON; each time, the substance obtained from JOHNSON tested positive for the presence of cocaine or fentanyl. With respect to the third transaction, which occurred on or about June 2, 2026, UCA met with JOHNSON at a prearranged meeting location in Chicago. During the meeting, JOHNSON provided approximately 43.5 grams of pills which contained fentanyl to UCA, in exchange for approximately $2,400.

**B. Identification of JOHNSON**

7. On or about May 13, 2026, an ATF confidential source ("CS-1")[1] identified JOHNSON[2] as a narcotics trafficker who operated in Chicago, Illinois. Specifically, CS-1 told law enforcement that an individual known to CS-1 as "JAX" later identified by law enforcement as JOHNSON, was offering to sell quantities of fentanyl.

8. On or about May 23, 2026, CS-1 relayed to law enforcement officials that JOHNSON sells "pressed percs" suspected to contain quantities of fentanyl, and that CS-1 observed JOHNSON possess suspected counterfeit Percocet pills, which were blue in color. CS-1 identified the telephone number he had been provided for JOHNSON as 872-***-9983 (the "JOHNSON Phone").[3]

---

[1] CS-1 is a documented confidential informant with the ATF. According to ATF agents with knowledge of the investigation, CS-1 has cooperated with ATF since approximately October 2017, though he/she was deactivated for a portion of that time due to an arrest. CS-1 has been paid approximately $170,000 for his/her cooperation. CS-1 has prior felony convictions and/or was arrested for firearm and narcotics related charges.

[2] Law enforcement displayed an unlabeled Chicago Police Department ("CPD") booking photograph of JOHNSON to CS-1, who positively identified JOHNSON as the same individual he/she knows as "JAX" residing in Chicago, Illinois.

[3] The identification of JOHNSON, and JOHNSON as the user of the JOHNSON Phone, is based in part, on the following: (1) according to CS-1, on or about May 13, 2026, JOHNSON identified his telephone number to CS-1 as the call number of the JOHNSON Phone; (2) from approximately May 13, 2026, to June 2, 2026, CS-1 communicated with a person over the JOHNSON Phone about completing drug transactions, and JOHNSON appeared in person to complete the drug transactions on the agreed-upon dates and locations discussed over the JOHNSON Phone; (3) law enforcement positively identified JOHNSON as the person who met with the UCA/CS-1 on May 19, 2026, to distribute narcotics, based on law enforcement's review of a known photograph of JOHNSON contained in CPD records and a comparison of that photograph to the person interacting with the UCA/CS-1 on June 2, 2026,

### C. On or About May 19, 2026, JOHNSON Distributed Approximately 8 Grams of Fentanyl

9. Between approximately May 13, 2026, and May 19, 2026, under the direction of law enforcement, CS-1 conducted recorded telephone calls and exchanged several consensually recorded text messages with JOHNSON, who was using the JOHNSON Phone. For example, on May 18, 2026, during a recorded telephone call between CS-1 and JOHNSON, using the JOHNSON Phone, CS-1 informed JOHNSON that CS-1 wanted to purchase 50 - 100 "blues," by which CS-1 was referring to 50 – 100 blue pills containing narcotics .[4] JOHNSON confirmed he would have them for CS-1 the next day. On May 19, 2026 CS-1 exchanged a series of consensually recorded text messages with JOHNSON, using the JOHNSON Phone. During the messages, CS-1 confirmed that CS-1 wanted to purchase "100 percs u told me $600," and JOHNSON agreed to meet that day near Madison Street and Pulaski Road in Chicago. Based on my training and experience and familiarity with the

[4] This affidavit does not describe every communication between JOHNSON and CS-1. My descriptions of certain recorded communications are summaries of the communications and may not include the entirety of the communications. Where recorded conversations are discussed in this affidavit, the language that is quoted from the recorded conversations is based upon a preliminary review of the recorded conversations and not on final transcripts of the recorded conversations. These summaries and excerpts do not necessarily include all statements or topics discussed during the course of the recorded conversations, nor do quotes summarized in succession necessarily reflect all statements made between the quotes. Any times listed for communications are approximate. At various points in the affidavit, I have included, either in brackets or summary form, my interpretation of words and phrases used in the recorded communications. My interpretations are based on the contents and context of the recorded communications, events occurring before and after the communications, my knowledge of the investigation as a whole, information received from CS-1 and CS-2, my experience and training, and the experience of other law enforcement agents.

investigation, I believe that in the above call, JOHNSON agrees to sell 100 pills containing narcotics to CS-1 for $600.

10. On or about May 19, 2026, at approximately 12:36 p.m., the UCA was equipped with audio and video recording devices and a transmitter. The UCA, accompanied by CS-1 and a second confidential source ("CS-2")[5], then traveled in the UCA's vehicle ("UCV") to the vicinity of Madison Street and Pulaski Road and parked in the area of the 4000 block of W. Monroe Street.

11. According to UCA, shortly after arriving, during this meeting, as captured by UCA's recording device and verified by UCA:

a. UCA observed a vehicle park across from the UCV on Monroe Street. UCA observed JOHNSON exit the vehicle and approach the passenger side window of the UCV.

b. Once JOHNSON was at the window, UCA observed JOHNSON hand CS-1 multiple clear knotted plastic baggies containing blue pills. UCA heard JOHNSON say "that's the whole hundred. The one big ball that's fifty the other two, twenty five, twenty five."

[5] CS-2 is a documented confidential informant with the ATF and has provided information to law enforcement in the past which has been corroborated through controlled purchases of narcotics and firearms. CS-2 has been deemed to be reliable by the totality of the investigation to date. CS-2 has been convicted and/or arrested of firearm and/or narcotics related charges. CS-2 has been working with ATF for monetary compensation since approximately 2023. CS-2 has been paid approximately $173,000 for his/her cooperation.

c. UCA observed CS-1 provide JOHNSON with $300 in prerecorded investigative funds, and UCA then provided JOHNSON with $300 as well, in exchange for the suspected narcotics.

12. According to testing and analysis by the Drug Enforcement Administration North Central Laboratory, the substance in the blue pills from the baggies received from JOHNSON tested positive for fentanyl and weighed approximately 8.5 grams.

**D. On or About May 27, 2026, JOHNSON Distributed Approximately 23 Grams of Cocaine**

13. Between approximately May 26, 2026, and May 27, 2026, under the direction of law enforcement, CS-1 conducted recorded telephone calls and exchanged several consensually recorded text messages with JOHNSON, who was using the JOHNSON Phone. In particular, on May 27, 2026, CS-1 exchanged a series of consensually recorded text messages with JOHNSON in which JOHNSON agreed to sell CS-1 "400 pills its 2400" and JOHNSON wrote that they would meet at the same location "from last time." Based on my training and experience and familiarity with the investigation, I believe that in the above call, JOHNSON agreed to sell 400 pills of narcotics to CS-1 for $2,400 at the same location as the May 19, 2026 transaction.

14. On or about May 27, 2026, at approximately 12:40 p.m., the UCA was equipped with audio and video recording devices and a transmitter. The UCA, accompanied by CS-1 and CS-2, then traveled in the UCV to the vicinity of Madison Street and Pulaski Road and parked on the 4000 of W. Monroe Street.

15. According to UCA , shortly after arriving:

a. UCA observed JOHNSON and an unidentified male ("UM") approach the UCV. UCA observed JOHNSON hand CS-1 a clear knotted plastic baggy containing blue pills.

b. UCA heard JOHNSON say "that's three," which UCA understood to mean 300 pills. CS-1 then asked how much for "300 pills?" JOHNSON stated "Eighteen," which UCA understood to mean $1,800.

c. UCA handed JOHNSON $1,800 in prerecorded investigative funds and asked if JOHNSON could get 400 pills. JOHNSON explained to UCA it would take 30-40 minutes to get the 100 extra pills.

d. UCA observed CS-1 exit the UCV and ask JOHNSON if he had any firearms for sale, which JOHNSON and UM agreed to sell CS-1 for $1,000 at a later time. UCA agreed with JOHNSON to meet at a later time for the firearm and left the location.

16. According to testing and analysis by the Drug Enforcement Administration North Central Laboratory, the substance in the blue pills from the baggies received from JOHNSON tested positive for cocaine and weighed approximately 22.1 grams.

**E. On or About June 2, 2026, JOHNSON Distributed Approximately 43 Grams of Fentanyl**

17. Between on or about June 1, 2026, and June 2, 2026, under the direction of law enforcement, CS-1 conducted recorded telephone calls and exchanged several consensually recorded text messages with JOHNSON, who was using the JOHNSON Phone. On June 2, 2026, CS-1 exchanged a series of consensually recorded text

messages with JOHNSON in which JOHNSON agreed to sell CS-1 additional narcotics pills. In particular JOHNSON and CS-1 had the following exchange:

JOHNSON: I got everything ready fa yu

JOHNSON: N I got da 400 [narcotics pills] Ona other stuff as well

UC-1: Ok bet bet let me see what time I can be up there

18. On June 2, 2026, CS-1 exchanged a series of consensually recorded text messages with JOHNSON, using the JOHNSON Phone, in which they agreed to meet near the same area of Madison Street and Pulaski Road.

19. On or about June 2, 2026, at approximately 4:15 p.m., the UCA was equipped with audio and video recording devices and a transmitter. The UCA, accompanied by CS-1 and CS-2, then traveled in UCV to the vicinity of Madison Street and Pulaski Road and parked in the area of the 4000 block of W. Monroe Street.

20. According to UCA, shortly after arriving in the area:

a. UCA observed JOHNSON approach the UCV and hand CS-1 a clear knotted plastic baggy containing blue pills.

b. UCA asked JOHNSON if the plastic bag contained 400 pills. UCA heard JOHNSON respond "that's 400…its even balled up in twenty fives."

c. CS-1 asked JOHNSON about the firearm and JOHNSON responded he would have to buy it and agreed to return in 15 minutes.

d. UCA handed JOHNSON $2,400 in prerecorded investigative funds for the suspected narcotics. UCA agreed to return and left the area.

21. Later that day, UCA, CS-1, and CS-2 traveled back to the area of Madison Street and Pulaksi Road. UCA observed JOHNSON in the front yard of a residence on the 4000 block of W Monroe Street, wearing the same black jacket he had worn earlier in the day, but wearing a full black face covering. UCA observed, as captured on UCA's recording device and confirmed by UCA, JOHNSON approached the UCV and instructed CS-1 to take the firearm out of JOHNSON's jacket pocket. CS-1 retrieved the firearm from JOHNSON's jacket and handed the firearm to UCA. UCA counted $1,000 in prerecorded investigative funds, which UCA then handed to JOHNSON for the firearm transaction.

22. After the transaction was complete UCA, CS-1, and CS-2 left the area in the UCV.

23. According to testing and analysis by the Drug Enforcement Administration North Central Laboratory, the substance in the blue pills in the baggies received from JOHNSON tested positive for fentanyl and weighed approximately 43.5 grams.

**CONCLUSION**

24. Based on the foregoing, I respectfully submit that there is probable cause to believe that on or about June 2, 2026, LAMARCUS JOHNSON did knowingly and intentionally distribute a controlled substance, namely 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

SEAN AHERN
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SWORN TO AND AFFIRMED by telephone September 5, 2026.

Honorable YOUNG B. KIM
United States Magistrate Judge